Good morning, Your Honors. Nicole O'Connor on behalf of the Appellants, Sergeant Marion O'Neill and Officer Joseph Hynes. The District Court erred in this case for two main reasons. First, it failed to instruct the jury on the community caretaking exception to the warrant requirement. And second, it failed to grant Sergeant O'Neill with qualified immunity for the search. Turning first to the reasons why the District Court should have instructed on community caretaking, as this Court has recognized many times over, a party is entitled to have her legal theories, which are supported by the record, presented to the jury. The case for two main reasons. First, that Sergeant O'Neill had an investigatory motive. And second, that according to the District Court, Sergeant O'Neill didn't have a factual nexus for believing that the suspect fled into 16th Farrington. This reasoning is problematic because it completely ignores the factual record in this case, as well as the law. Well, let's, again, as I said in an earlier case, let's not make the point of emphasis the District Court's reasoning, because here again, our review is de novo, right? And I have two problems with this claim of error. One is the proffered instruction, which has, in my mind, two defects that you've got to grapple with. One is the fact that it contains no standard by which a jury could have determined whether the community caretaking function was properly in play. And the second is that if the Court had given that instruction, no rational jury could have found for you, because that instruction contained a dictate that the to ongoing criminal investigations. And this was clearly, unarguably on the record, part of an ongoing criminal investigation, a manhunt for someone who had just robbed the store. We also requested, Your Honor, language from the Rodriguez-Morales case that the fact that the officer also had an investigatory motive does not render the search confirmed. Yeah, but you've taken that language, you've wrested it from its contractual moorings. There's a heartland to the community caretaking exception. And that heartland, under Cady, the Supreme Court case, the principal requirement of that heartland is that it not be part of an ongoing criminal investigation. Once you get outside of that, the language in Rodriguez-Morales means, if you're within the heartland of the community caretaking exception, the fact that someone suspects that the officer may have investigatory motives isn't enough to defeat the community caretaking claim. That's simply a reaffirmation of the doctrine that the Supreme Court laid down and ran and a slew of other cases, that we look at these search cases on the basis of objective criteria, not the officer's subjective intent. And I think it makes sense to think about the evolution of the community caretaking exception and why it and it doesn't make any sense to simply apply that in a situation where there's no investigatory motive. It happens often that there are coexisting investigatory motives and... But why did the Cady Court, the Supreme Court, take such pains to exempt from the community caretaking realm cases where there were ongoing criminal investigations? I mean, aren't we bound by that statement of the Supreme Court? No, I think that this Court said in the United States v. Kosha in 2006, again... But Kosha merely relied on Rodriguez-Morales, and you quote language that you think helps you in you ignore the sentence immediately before that language, which ends with the phrase, aside from ongoing criminal investigations. So Rodriguez-Morales, the language on which you write, had nothing to do with that. Rodriguez-Morales followed, as indeed it must, what the Supreme Court had said in Cody. I understand that that is what the Supreme Court said. I don't think it makes sense to apply that in every circumstance where there is an investigatory motive. There are state jurisdictions... But when motive... motive... I've been trying to get across to you. Motive isn't what counts here. We're looking at objective reasonableness, because under your who wants to go into any dwelling while he's in hot pursuit of a fleeing felon in the middle of an ongoing investigation, can always say, I feared for the occupants inside the house. That's why the Court had that language in Cody. That's why we repeated it in Rodriguez. Which is why perhaps it makes sense to not even consider whether the community caretaking exception justified Sergeant O'Neill's search. In this case, this Court need not even decide whether she properly invoked the community caretaking exception, because nonetheless, she would have been entitled to qualified immunity. She was entitled to qualified immunity if, if, if a reason, if the law wasn't clearly established, but you've cited no case, no case in which any court has refused to apply the KD dictate. I mean, how can the law be much more clearly established than a direct statement from the in other circuits have applied community caretaking in a much less dire circumstance. But not to ongoing criminal investigations. Not of this sort. Not where there's a fleeing felon situation. No court has applied that. I think I've looked pretty carefully. I've certainly read the cases in your brief. I understand. And I think that that, it just doesn't make to not apply, to limit that to an investigatory situation. Oftentimes, officers are faced with situations where they have both investigatory motives and community caretaking functions. And we recognize as the role of a police officer has evolved since the time the framers were drafted in the Constitution. At that time, neighbors took care of one another. And now, we need to rely on police officers. That's become a role that police officers have taken on. Yeah, but here, at least as I understand the record, the door was closed. There was no evidence that he had gone, that the criminal they were looking for, alleged criminal they were looking for, had gone into the house. Your client went up to the door, found it open, or unlocked, then said, open door, because she had opened it. Doesn't that belie the argument that it wasn't really part of her investigation, rather than her community care argument, which seems to come late in the case? Other courts have found the Eighth Circuit in Quesada, there was a closed door in that case. And officers are allowed to rely on what they subjectively perceive when they are investigating. She was led to that address by the victim of the robbery, Mr. Augusto Perez. Officer Hines had been directed specifically to the walkway at 16th Farrington. The walkway? Exactly. And when she approached the front door, there was a large glass panel on the exterior door. And she saw that two interior doors appeared to be blown open. They heard footsteps upstairs, but no one was coming to the door. So based on what she perceived at that time, she was not only, yes, looking for a criminal suspect, but very much concerned that there might be an occupant inside who might be in danger. But that sounds to me like not community caretaking, but exigent circumstances. If she really had reason to believe that the fleeing felon was inside and there was an occupant who was in danger, but the jury rejected exigent circumstances. Judge Sarikin charged on that doctrine and the jury rejected it. But the court also instructed that she needed to have probable cause in order to search the home under exigent circumstances. That's the exigent circumstances rule. And it's our position that community caretaking has a less exacting standard. It's not probable cause. It's just if the officer has a reasonable belief that there is some sort of situation emergency hazard unfolding that requires her attention, she is allowed to enter. So long as that's... It's significant, is it not, that the qualified immunity ruling that you're appealing is a ruling that's made at the end of the case, right? So that since jury returned against you, we've got to take the facts in the light most favorable to the verdict, even for qualified immunity purpose. In this case, you don't because there were no disputed facts. Oh, yes, there are. The district court noted in its opinion that there were at least three disputed facts, one of which was whether or not there were footsteps from the upstairs of the house. But these were credibility determinations. The district court looked erroneously, in our opinion, to the jury for guidance on whether or not that search was reasonable and reached a series of impermissible conclusions, such as the one your honor has just cited. But wasn't there testimony from the plaintiff here that he was in the house asleep? So that sort of brings into doubt the question about having heard footsteps. Yeah, that makes it a disputed fact. He's the only one in the house, your client admits that, and he says he was asleep in his bed. I would submit... said that he heard footsteps. Well, that's a dispute. Both of those things can't be true. I would submit that the fact that Mr. Madelon is asleep in his bed means that he can't dispute any of what Sergeant O'Neill perceived to be true. He can't dispute whether or not... If somebody's asleep in the bed, says he's asleep in his bed, the sergeant says there were footsteps, and the fellow says, I was asleep in my bed. There was nobody on the second floor of my house. So again, as Judge Sully just said, that seems to be pretty clearly a disputed fact and not one that you can rely upon. I would respectfully disagree. If he's asleep, he can't determine whether or not she hears footsteps. He doesn't have an alternative. But the only way she can hear footsteps is if there's someone else in the house. And there was no one else. He said there was no one else in the house. She says there was no one else in the house. Because when she went in to investigate, he's the only person there. I would submit that there are a host of other facts that Sergeant O'Neill relied upon. Yes, there may be other facts, but I'm just pointing out that you would rely on that one. And in terms of the fact that her motive here was community caretaking and not investigatory, to the extent that motive is relevant at all, why would she wait 10 minutes for a canine to get there if she had some real concern that the occupant of the house was in danger? Sergeant O'Neill testified that it was Boston police procedure to employ a dog in that situation. The imperatives of the Fourth Amendment are... That's true, but that's an investigatory procedure. But for community... Not a rescue the person in danger procedure. But for community caretaking purposes, the imperatives of the Fourth Amendment are satisfied so long as that procedure is reasonable. And it seems that if she's following police protocol, which is what she testified to, any decision, it may not have been the best decision should she have gone in, sure. But the fact that she waited does not render the search infirm under community caretaking. It's still reasonable for that purpose. And I would... I see that I'm just about out of time, but I would, again, request that Sergeant O'Neill be entitled to qualified immunity because the situation is much more dire than other circumstances in East Ham. There was just an open door, a neighbor was concerned, and the police went in. And here, yes, she had an investigatory motive, but she was also concerned for the safety of any occupants inside. Thank you. Thank you. May it please the court. My name is Robert Sinsheimer and I represent Mr. Manlon. I'd like to begin outside of any prepared text I have and pick up with a comment from Justice Well, Mr. Sinsheimer, if you're going to do that, first of all, we're not justices. We're judges. Excuse me, Your Honor. The justices of the nine folks down in Washington. I didn't mean to promote you, but if Your Honor, please. Did you say promote or provoke? I fear the latter and I apologize for the former. I thought that it was a good way to reconcile an issue I've struggled with which is the language in Rodriguez-Morales, quote, totally divorced from criminal investigation and language in other cases such as Kosher where there's an acknowledgement that sometimes total and divorced can't work. A human mind might be able to carry more than one thought simultaneously. But once one looks at it with that heartland concept, going back to Katie, that's actually an easy reconciliation and I suggest it's the right one because of one other procedural point that hasn't been discussed and that's this. Most of the cases that address community caretaking function come in the circumstance of criminal procedure. The cops believe that they're acting pursuant to some kind of a caretaker function. They go in the house. They find contraband and the defendant is moving to suppress. And the question becomes whether a criminal prosecution can be lost where the police acted in utter good faith and stumbled upon something. Now, in this situation, Mr. Madelon has been absolved of any wrongdoing. He brings a civil rights violation claim which we have proved and we shouldered the burden of proof gladly and demonstrated that the community caretaker function was not part of this case in any way. This case was about a manhunt as the court has already determined and that's all there is to it. Now, when we- Counsel, before you get too far away from your suggestion that this tends to apply in criminal cases where the police were properly doing community caretaking and then stumbled upon something, you don't have to go that far, right? You could have procedures in place for removing cars off the street and then you've got inventory procedures. None of that is really stumbling upon. It's just following those procedures. You're absolutely right. And I did go too far because I was speaking sort of colloquially and now you've narrowed it into the fact that we do allow inventory searches as a part of the community caretaker function. That was Kocha, the guy who was crazy and they call the FBI and he gets pink papered. Someone's got to do something with his car. I just wanted to clarify that. No, I think you're absolutely right, Your Honor, and it's a good clarification. But my point is exactly the same as both your point respectfully and Judge Salyer's point, which is that this concept can be easily reconciled. Maybe totally divorce is a little bit outside. I don't want to be critical, but also to simply say you can have both concepts in your mind is way too broad. The correct approach has to be that heartland, that's one word, primary good faith motivation, although we don't want to be focusing too much on motivation. The point is the primary reason has to be something that's not connected to a criminal investigation, whether it be stumbling or whether it be engaging in a perfectly acceptable routine process such as inventorying an automobile. And I also point out, by the way, in the inventory cases, they involve cars, whereas the Fourth Amendment dogma has always, always suggested that the home is at least first among equals. This is an invasion into an individual's home by a police force, not an individual, without any probable cause whatsoever and without any good faith justification whatsoever. Now, there are a couple of technical points I made in the brief, and I just want to run by them very quickly. And the first is that the timing of the motion is, I suggest respectfully, problematic in the least, and maybe even undercuts the credibility of the proposition at all. What happened here was we defended the case because they alleged hot pursuit. And by they, I mean the witness herself when she said she was told that someone ran inside, that's the exact word, inside the home. And she said that under pains and penalties of perjury in an interrogatory that was sent to my office. And we investigated that. We took depositions. After that was disproved or proved to be false, however you want to look at it, we then get a motion eliminated, virtually the night before trial. That's a backhanded substitute for summary judgment.  And we opposed it. And the judge ruled against the government, and then they renewed it post-trial. And you've read, I could see Judge Soroka's decision, which we think is a correct decision. I understand review is de novo, but we think it is a systemically correct decision. And I think that covers the qualified immunity. Now, the second sort of technical point, the second sort of technical point is that there are credibility questions. And your honors have seized upon them. I do want to cite Reich versus Petrovsky, which is not in my brief, 623rd, F3rd, 30, for a proposition that Judge Selya also mentioned, which is that this is post-verdict. And therefore... You would better send us that case in a 28-day order. Sure. I'd be happy to do that. And it's also cited in Judge Soroka's order. It's not in my brief, but it is in his order, in his ruling. So I think that covers the question of the instructions. I'd like to say a word, and I will rest on the brief, unless there are further questions about both the instructions and qualified immunity. As to those, I do want to comment briefly on the fee question. Now, it is significant in this case that we have an excessive force verdict against the officer who did not appeal the substance. And it's significant for a lot of reasons, primarily because it provides an order of the court that Mr. Madelon has prevailed. But also, I think it provides some information about Ms. O'Neill's attitude, who says that she was there to protect the homeowner. Her lawyer just said something along those lines. And yet, five minutes after he's encountered, he's slammed into the ground, and his nose is harmed, and he's placed under arrest for something he didn't do. The total lack of respect by all of these officers toward Mr. Madelon's rights as a person who's innocent of any crime, simply asleep in his own bed, is astonishing. And she was literally standing there at the moment this excessive force took place. Now, our brief is very cursory on the question of excessive force, because I didn't want to test it in any way. But we cite the transcript pages, if you feel you want to go to them. It's very graphic and clear testimony, and the jury found in his favor. Now, we're awarded fees. And the only contest to the fees is this notion that some of my time was not, quote, core time, end quote. And I think that since it came before this honorable court, I'm going to respectfully suggest that this is a good opportunity for this court to do away with that distinction. There's no need for that distinction whatsoever in the jurisprudence. There's also no need to do away with it. I mean, the fact of the matter is, it's a very useful tool for district judges in certain cases. We've said the goal here is to get to the lodestar. Right. There is not one single mechanical way to get to a lodestar. Judge Stahl's been a district judge. I've been a district judge. You can get to the lodestar in a number of different ways, and all of them may be reasonable if you do them properly and if you explain what you're doing in an opinion. And one of those ways, which a district judge certainly can use, we said as much in the Brewster case, is to distinguish between core and non-core activities and use a multi-tiered rate system based on that distinction. The real issue that this case presents is the defendant's insistence that that is not only a tool that's available to district judges, but it's a requirement that district judges do it that way. And that's the argument. Well, that's right. And that's exactly the argument they made, and we opposed it in our brief, because that's not the law. Never has been the law. And he did analyze it. And if you're not going to do away with it, or if the court actually feels it has utility, it doesn't matter that much for this case. Because I agree with Your Honor's view that the suggestion that it must be applied as a matter of law simply is incorrect. And that's our primary legal argument in our brief. It's an incorrect argument that the government has made, and so we should prevail on that point. Well, did the judge, in effect, review your fee application, allowed most of it, but not all of it? That's correct. And he, you know, one of the reasons I do press to reconsider, Your Honor, you are correct that the Lone Star requires a lot of analysis, and there are many, many factors. I think it's unintentionally insulting to the plaintiff's civil rights bar to suggest that somebody who's not in our office, who's not involved in our practices, who's not actually trying the case, knows what core is and what core isn't. I can tell you, if you pardon me personalizing it. I don't see what this has got to do with the plaintiff's civil rights bar. The Lone Star applies to something like, the last time I counted, 96 or 97 government fee-shifting, federal fee-shifting statutes, of which plaintiff's civil rights statutes constitute a mere handful. So this distinction, and the way you go about calculating the Lone Star, applies to virtually every prevailing party in a federal statutory case, civil rights or not. I hope you're just being overly sensitive when you try to limit it that way, rather than purposefully confrontational. I'm certainly not trying to be confrontational, although perhaps I can't avoid it. I am suggesting that, whether it be the civil rights bar or any senior member of the bar who has the ability to both delegate and manage his or her own time, almost certainly is going to utilize core time. I can tell you, in this particular case, and this is part of the record, I hardly touched the case until the failed mediation. And then it was all trial, prep, and trial. Any experienced trial lawyer knows that the last two weeks, it's trial, prep, and trial. So I don't need to press that to win. I thought it would be something that the court might find interesting because it's raised in a kind of odd circumstance. I personally happen to believe it has no utility. I leave it to the court's view because it doesn't matter in terms of whether we prevail on that aspect of the case. And unless there are further questions, I will rest. Thank you both.